IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

MYLAN PHARMACEUTICALS, INC.

        Plaintiff,

v.                 //    CIVIL ACTION NO. 1:07CV4
                           (Judge Keeley)

UNITED STEEL, PAPER AND FORESTRY,
RUBBER, MANUFACTURING, ENERGY,
ALLIED INDUSTRIAL AND SERVICE WORKERS
INTERNATIONAL UNION, LOCAL 8-957,

        Defendant.

### MEMORANDUM OPINION AND ORDER

Before the Court are the parties' cross motions for summary judgment. The plaintiff, Mylan Pharmaceuticals, Inc. ("Mylan"), is a developer, manufacturer and distributer of generic prescription drugs. The defendant, United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, Local 8-957 (the "Union"), represents the production employees at Mylan's facility in Morgantown, West Virginia.

In this lawsuit, Mylan seeks to vacate an arbitration award ("the Award") reinstating Grievant and collective bargaining unit member, John Jones ("Jones"). The Union seeks to enforce the Award, which held that Mylan discharged Jones without just cause, in violation of the parties' April 8, 2002 Collective Bargaining Agreement ("CBA"). The Award further ordered that Jones be reinstated subject to a disciplinary suspension of ten working

<u>MEMORANDUM OPINION AND ORDER</u>

days.  For the reasons discussed below, the Court **DENIES** Mylan's

motion for summary judgment, **GRANTS** the Union's motion for summary

judgment, and **UPHOLDS** the Award.

## I.  Factual Background

In  January  2000,  Jones  began  working  for  Mylan  in  the

Granulation Department as a Compactor-Fitzmill Operator.  In this

position, he ran sieve tests to determine the density of raw drug

materials that are later compacted into tablets or capsules.[1]  On

April 25, 2005, when the results of one of these sieve tests failed

to  conform  to  pre-established  parameters,  Jones  manipulated  the

results  and  recorded  false  numbers  on  a  data  sheet.   After  a

supervisor noticed a problem with the test, Jones admitted that he

had  altered  the  numbers,  and  further  disclosed  that  he  had

manipulated data approximately fifty times in the past.[2]

---

[1]     Testimony  adduced  at  the  arbitration  hearing  indicated
that  these  tests  do  not  implicate  the  potency  of  the  final  drug
product,  but  could  impact  the  final  product's  drug  release
behavior.

[2]     Jones  testified  at  the  arbitration  hearing  that  fellow
Compactor-Fitzmill Operators had trained him to manipulate the data
in this way, and that he believed "that's what everybody wanted,"
including  his  supervisors.   Jones  failed  to  corroborate  this
assertion,  however,  and  the  Arbitrator  did  not  rely  on  this
evidence in his decision.

## MEMORANDUM OPINION AND ORDER

On May 20, 2005, approximately one month after discovering that Jones had manipulated data, Mylan discharged him for violating Mylan's Code of Conduct and also for violating the Food and Drug Administration's ("FDA") Code of Federal Regulations.

Under Mylan's Code of Conduct, violations are categorized into four levels, with Group IV constituting the most serious offenses. Mylan charged Jones with the following violations:

> Group IV, Rule 1 - Falsification of any records, reports, accident or insurance claims, medical excuses, etc.;

> Group III, Rule 7 - Conduct which interferes with or poses a conflict of interest with the efficient, orderly or safe operation of the Company's business;

> Group II, Rule 2 - Failure to follow Standard Operating Procedures (specifically SOP-1400 and 1401), Good Manufacturing Practices, or Good Laboratory Practices; and

> Group I, Rule 11 - Failure to satisfactorily carry out the duties and responsibilities of assignments.

The Code of Conduct also provides for progressive disciplinary responses, called "corrective measures," that increase in punitive impact at each offense level. For example, a first-time Group I violation warrants a written warning; the corrective measure for a first-time violation in Group IV, on the other hand, includes "suspension of employment for up to forty-five (45) work days or termination of employment, depending upon the nature and character of the prohibited conduct."

<u>MEMORANDUM OPINION AND ORDER</u>

Mylan promulgated its Code of Conduct pursuant to authority reserved to it by the parties' CBA.  Under the CBA, Mylan has the exclusive right to manage its business and direct and control its workforce so long as this right is exercised in a manner consistent with other provisions of the CBA.  Mylan, however, may only discharge an employee for just cause.

The CBA further provides that any claims of improper discipline or discharge must be resolved pursuant to a grievance procedure and, ultimately, may be determined by final and binding arbitration.  In reviewing an action, the arbitrator's authority under the CBA is confined to "application and interpretation of the specified provision or provisions of the agreement at issue," and the arbitrator cannot "alter, amend, delete or add" to any of the terms of the CBA.

After Mylan discharged Jones, the Union initiated a grievance process in which it argued that, by terminating Jones for a first-time offense, Mylan had subjected him to disparate treatment. Arbitrator David Petersen held a hearing in this matter on November 10, 2005 and issued a final decision on November 28, 2006.

At the arbitration hearing, Mylan established that Jones' manipulation of data violated not only its own Standard Operating Procedures ("SOPs") but also the industry's Good Manufacturing

Practices ("GMPs"), which are determined by the FDA.  Through the testimony of Paul Vogel ("Vogel"), a former senior FDA employee and expert on FDA policies and procedures, it established that federal law prohibits adulterating a pharmaceutical and that a drug is considered adulterated if it is not manufactured in conformance with GMPs.  Mylan further established that the FDA may sanction a manufacturer who is not in compliance with GMPs by issuing a warning letter, by asking a federal court to seize the goods, or by seeking an injunction to shut down the company.

On cross-examination, Vogel admitted that the FDA does not discipline manufacturing employees directly, nor does it mandate what type of discipline an employee found to have violated a GMP should receive.  Rather, the FDA requires only that an employer take appropriate corrective action.

Through employee disciplinary records, at the arbitration the Union documented that no other collective bargaining unit worker at Mylan had ever been successfully discharged for a first-time violation, even for a violation of a Group IV rule.

In his ruling, Arbitrator Petersen considered Mylan's Code of Conduct and its range of corrective measures, noting that, in the Introduction to its Code of Conduct, Mylan states that it is "the Company's intention to enforce this Code in a reasonable and fair

<u>MEMORANDUM OPINION AND ORDER</u>

manner that will not only protect its legitimate business interests, but also the legitimate interests and concerns of its employees." He observed that, in more than five years of service at Mylan prior to this incident, Jones had never been disciplined. He also recognized that Mylan had offered evidence that it had previously successfully discharged an employee without strictly following progressive disciplinary procedures, but noted that, unlike Jones, that employee had a disciplinary history.

Thus, because it "was not shown that the Company had ever imposed discharge for a first occurrence of a rule violation where the employee had significant service and had never previously been disciplined for any offense," and because "it was not shown that Grievant's misconduct was so egregious that it warranted summary discharge regardless of his previously clean discipline record," the Arbitrator concluded that Mylan had not enforced the Code of Conduct in a reasonable and fair manner and had discharged Jones without just cause. He thus awarded Jones reinstatement, subject to a suspension of ten working days.

Mylan appealed the Award to this Court, contending that it fails to draw its essence from the CBA and instead reflects the Arbitrator's own notions of industrial justice. Additionally, Mylan contends that the Award violates public policy and therefore

may not be upheld.  The Union asks the Court to uphold the Award as valid and enforceable, and further seeks a finding that Mylan initiated this suit without justification.

## II.  Standards of Review

### A.  Summary Judgment

A court may grant a motion for summary judgment when the record reveals "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Here, the parties agree that no facts are in dispute.  Accordingly, the Court must determine, as a matter of law, whether to vacate or uphold the arbitration award.

### B.  Review of Arbitration Awards

In reviewing arbitration awards, "a reviewing court generally defers to the arbitrator's reasoning." Mountaineer Gas Co. v. Oil, Chemical & Atomic Workers Int'l Union, 76 F.3d 606, 608 (4th Cir. 1996), cert. denied, Oil, Chemical & Atomic Workers Int'l. Union v. Mountaineer Gas Co., 519 U.S. 822 (1996).  Indeed, "[j]udicial review of an arbitration award has been characterized as 'among the narrowest known to the law.'"  Westvaco Corp. v. United Paperworkers Intern. Union, AFL-CIO, 171 F.3d 971, 974 (4th Cir. 1999)(quoting Union Pac. R.R. Co. v. Sheehan, 439 U.S. 89, 91 (1978)).

In a prior case between these same parties, this Court explained the policy underlying the deferential standard used in reviewing arbitration decisions:

> By granting an arbitrator binding authority to interpret the terms of their contract, parties "bargain[] for" the "arbitrator's construction" of that contract. <u>Eastern Associated Coal Corporation v. United Mine Workers of America, District 17, et. al.</u>, 531 U.S. 57, 61-62 (2000)(<u>citing</u> <u>United Steelworkers of America v. Enterprise Wheel & Car Corp.</u>, 363 U.S. 593, 599 (1960)). Accordingly, courts must give such construction "full play" to ensure that long-standing labor policy is effectuated. <u>See</u> <u>United Steelworkers of America v. American Manufacturing Co.</u>, 363 U.S. 564, 566 (1960)(discussing Section 203(d) of the Labor Management Relations Act, 1947). Thus, when parties have agreed to submit questions of contract interpretation to an arbitrator and a grievance under that contract is filed, "courts . . . have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim." <u>Id.</u> at 568. Rather, "'as long as [an honest] arbitrator is even arguably construing or applying the contract and acting within the scope of his authority,' the fact that 'a court is convinced he committed serious error does not suffice to overturn his decision.'" <u>Eastern</u>, 531 U.S. at 61-62 (<u>quoting</u> <u>Paperworkers v. Misco, Inc.</u>, 484 U.S. 29, 38 (1987).

<u>Mylan Pharm., Inc. v. United Steel, Paper and Forestry, Rubber, Mfg., Energy, Allied Indus. and Serv. Workers Int'l Union</u>, 471 F.Supp.2d 667, 672 (N.D.W.V. 2007) ("<u>Mylan I</u>"). Thus, "[a]bsent the most unusual of circumstances, courts must uphold and enforce arbitral awards," because "arbitration must be final to be effective." <u>Westvaco Corp.</u>, 171 F.3d at 974.

_____

MEMORANDUM OPINION AND ORDER

_____

Despite this strict standard of review, an arbitration award may be overturned if it "violates well-settled and prevailing public policy, fails to draw its essence from the collective bargaining agreement, or reflects the arbitrator's own notions of right and wrong." <u>Mountaineer Gas</u>, 76 F.3d at 608 (<u>citing</u> <u>United Paperworkers Intern. Union, AFL-CIO v. Misco, Inc.</u>, 484 U.S. 29, 36 (1987)).  Here, Mylan alleges that Arbitrator Petersen's award violates public policy, fails to draw its essence from the CBA, and improperly reflects his personal notion of right and wrong.  The Court addresses these claims seriatim below.

### III.  Discussion

**A.    The Award does not violate clearly-defined public policy**.

"[A] court may not enforce a collective-bargaining agreement that is contrary to public policy" and "the question of public policy is ultimately one for resolution by the courts." <u>W.R. Grace & Co. v. Local Union 759, Int'l Union of the United Rubber, Cork, Linoleum and Plastic Workers of America</u>, 461 U.S. 757, 766 (1983). The issue for consideration here is whether the arbitrator's interpretation of the CBA violates an explicit public policy that is "well defined and dominant."  <u>Misco</u>, 484 U.S. at 43 (<u>quoting</u> <u>W.R. Grace</u>, 461 U.S. at 766).  The particular public policy is to be "ascertained by reference to the laws and legal precedents and

not from general considerations of supposed public interests." Id. (internal quotations omitted).  Thus, the question is not whether Jones violated public policy by manipulating test data, but whether the Award interpreted the parties' CBA in a way that violates well-defined, explicit public policy.

The federal Food, Drug, and Cosmetic Act ("FDCA") expressly prohibits "[t]he introduction or delivery for introduction into interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded."  21 U.S.C. § 331 (2007).  A drug is deemed to be adulterated when, among other things,

> the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice . . . .

21 U.S.C. § 351(a)(2)(B) (1997).  Thus, failing to strictly comply with any current GMP during the manufacturing process will render a drug "adulterated."  The Federal Code of Regulations sets forth applicable GMPs and provides that any person responsible for noncompliance with the GMPs will be subject to regulatory action. 21 C.F.R. § 210.1 (2005).

Mylan cites this Court's decision in Mylan I for the proposition that there exists "an explicit, well-defined and dominant public policy of preventing the sale of adulterated

drugs." 471 F.Supp.2d at 674-75. The company asserts, and the Court agrees, that Jones violated this public policy by manipulating data in violation of Mylan's SOPs and the GMPs promulgated by the FDA. Specifically, Mylan cites a GMP requiring accurate record keeping:

> Written production and process control procedures shall be followed in the execution of the various production and process control functions and shall be documented at the time of performance. Any deviation from the written procedures shall be recorded and justified.

21 C.F.R. § 211.100(b). Mylan contends that Jones violated this GMP by manipulating the test results and, thus, failing to keep accurate records.

In _Mylan I_, employee and bargaining unit member Irma Brooks was discharged after placing foreign objects into, and writing on, prescription drug bottles on the assembly line, thereby technically violating the public policy against allowing adulterated drugs into interstate commerce. There, as here, the issue before the Court was not whether the employee's acts violated public policy, but whether the arbitration award authorizing the employee's reinstatement and imposing lesser disciplinary sanctions under the CBA violated any well-defined and dominant public policy. 471 F.Supp.2d at 673.

<u>MEMORANDUM OPINION AND ORDER</u>

Considering the relevant public policy, this Court found that, although the FDCA and its implementing regulations clearly outline the current GMPs for the pharmaceutical industry and specify that regulatory sanctions shall apply to those who violate them, "they are silent with regard to what those sanctions may or should be." <u>Id.</u> at 674. This finding remains true. As Paul Vogel confirmed at Jones' arbitration hearing, the FDA expects a drug manufacturer to take adequate corrective measures when an employee violates a GMP, but no statute or regulation mandates what those measures must be.

In his decision, Arbitrator Petersen considered the range of sanctions for a Level IV violation as set forth in Mylan's Code of Conduct and determined that a lesser sanction was appropriate. Specifically, because Jones had no prior disciplinary record and the nature of the misconduct was not "so egregious that it warranted summary discharge regardless of his previously clean disciplinary record," Arbitrator Petersen imposed a disciplinary suspension of ten working days. Because no "well-defined and dominant public policy" explicitly requires any particular sanction for this type of violation, the Court cannot find that Arbitrator Petersen violated any such policy when he interpreted the CBA and determined that a sanction less than termination was warranted. Accordingly, the Court **UPHOLDS** the Award on public policy grounds.

   **B.   The Award draws its essence from the CBA and does not
         reflect the Arbitrator's personal notions of right and
         wrong.**

   Mylan also contends that the Award fails to draw its essence
from the parties' CBA, and instead reflects Arbitrator Petersen's
personal notions of right and wrong.  When an arbitration award is
challenged on these grounds, the question for the Court is "whether
the arbitrator did his job – not whether he did it well, correctly,
or reasonably, but simply whether he did it."  Mountaineer Gas, 76
F.3d at 608.  To make this determination, a court should examine
"(1) the arbitrator's role as defined by the CBA, (2) whether the
award ignored the plain language of the CBA, and (3) whether the
arbitrator's discretion in formulating the award comported with the
essence of the CBA's proscribed limits."  Id.

   **1.   Arbitrator Petersen's role as defined by the CBA.**

   The CBA at issue in this case is the same agreement
scrutinized in Mylan I.  As explained there, the CBA provides that
any disputes arising between Mylan and a Union employee regarding
claims of improper discipline or discharge are to be resolved
pursuant to the grievance and arbitration procedures set forth in
Article VI of the CBA. If a satisfactory settlement cannot be
obtained through a multi-step grievance process pursuant to these
procedures, then the dispute is referred to arbitration.

Article VI, section 6.5 of the CBA defines the arbitrator's authority:

> The jurisdiction and authority of the arbitrator shall be confined exclusively to the application or interpretation of a specified provision or provisions of the agreement at issue between the Union and Employer.  This is not intended to limit the arbitrator's consideration of the entire agreement in determining his award.

This section further specifies that an arbitrator may not "alter, amend, delete or add to any of the terms of the agreement." Finally, the arbitrator's decision "shall be final and binding on both parties."

While the arbitrator may not alter, delete, amend or add to the terms of the CBA, he should consider any "valid and proper policy promulgated by an employer pursuant to a collective bargaining agreement. . . ." 76 F.3d at 610.  In <u>Mountaineer Gas</u>, the Fourth Circuit Court of Appeals explained:

> [W]hen the collective bargaining agreement reserves to management the right to make and enforce disciplinary rules, any rule or policies promulgated in accordance with that authority are thus incorporated into the collective bargaining agreement and have the force of contract language.

<u>Id.</u>  As noted earlier, the CBA contains a management rights clause, pursuant to which Mylan promulgated its Code of Conduct.  That Code of Conduct, therefore, is incorporated into the CBA and was properly considered by the arbitrator in this case.

Finally, although an award "is legitimate only so long as it draws its essence from the collective bargaining agreement," an arbitrator may still look for guidance from other sources in interpreting the CBA. <u>United Steelworkers of Am. v. Enterprise Wheel & Car Corp.</u>, 363 U.S. 593, 597 (1960). In <u>United Steelworkers of America v. Warrior and Gulf Navigation Company</u>, 363 U.S. 574, 581-82 (1960), the United States Supreme Court stated:

> The labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law – the practices of the industry and the shop – is equally a part of the collective bargaining agreement although not expressed in it.

Thus, when interpreting a CBA the arbitrator may consider the customs and practices of the employer and the industry.

> **2.    The Award does not ignore the plain language of the CBA.**

Because Arbitrator Petersen found that Jones manipulated drug data and recorded false data onto testing sheets, facts that constitute a Level IV violation, and because discharge is permitted as a "corrective action" for a first-time Level IV offense, Mylan argues that the Award violated the plain language of the CBA.

Under Article XXXIII, Section 33.1 of the CBA, entitled "Management Rights," Mylan "exclusively has and retains all rights to manage its business and direct and control the working

force . . . as long as it is not inconsistent with the provisions of the Agreement." At first glance, this management rights clause in Article XXXIII appears to give Mylan broad discretion when it disciplines an employee. Upon closer scrutiny, however, it is clear that Section 33.1 restricts Mylan's actions by requiring conformance with the rest of the CBA, including those policies incorporated into the CBA, such as the Code of Conduct.

As Arbitrator Petersen found, the Code of Conduct specifically states that "[i]t is the Company's intention to enforce this Code in a reasonable and fair manner that will not only protect its legitimate business interests, but also the legitimate interests and concerns of its employees." Thus, when Mylan manages its workforce pursuant to the Code of Conduct, its decisions are subject to review for reasonableness and fairness.

In his decision, the Arbitrator agreed with Mylan that Jones had knowingly violated SOPs and GMPs and concluded that some discipline was appropriate. He, therefore, looked to Mylan's Code of Conduct and acknowledged that the sanction for a first time Level IV offense ranges from suspension for up to forty-five days to discharge. He next found that Mylan regularly imposed sanctions of suspension between one working day to fifteen working days in response to first-time Level IV violations, and in no instance had

it "discharged an employee for a first occurrence of a rule violation where the employee had significant service and had never previously been disciplined for any offense." Arbitrator Petersen then found that the Union had presented credible evidence that Mylan had acted in a disparate fashion in terminating Jones. Most importantly, he concluded that, "on these particular facts and circumstances, . . . the Company did not enforce the Code of Conduct in a reasonable and fair manner when it imposed discharge on Grievant for this misconduct."

Despite these findings, Mylan relies on the decision in <u>Mountaineer Gas</u> to argue that the Arbitrator injected his own notions of right and wrong into the Award. In that case, a public-utility company, Mountaineer Gas Company ("Mountaineer"), discharged an employee after a random drug test indicated the presence of marijuana metabolites in his system. 76 F.3d at 609. An arbitrator reviewing the discharge found that the employee occupied a safety-sensitive position, Mountaineer had a vested right under the CBA to randomly drug test its employees, and the test at issue was not defective. <u>Id.</u> Nevertheless, the arbitrator found that the employee's "unblemished work history of over 15 years of employment with Mountaineer," even when taken in

conjunction with the circumstance of the case, did not justify discharge.  Id.

Mountaineer appealed the arbitrator's award reinstating the employee, and the district court for the Southern District of West Virginia overturned the award.  Id. at 607.  In affirming the district court's decision, the Fourth Circuit found that the drug policy was a valid and proper policy promulgated pursuant to the parties' CBA, and, thus, was incorporated into the CBA.  Id. at 610.  The policy mandated that, absent a legitimate medical reason, any employee testing positive would be promptly discharged.  Id. at 609.  The Court thus found that, by reinstating the employee, the arbitrator had ignored the plain language of the CBA.  Id. at 610.

In contrast to the drug policy in Mountaineer Gas that mandated termination of any employee with a positive drug test, Mylan's Code of Conduct provides that a first violation of a Level IV offense may result in either termination or "suspension of employment for up to forty-five (45) work days . . . depending upon the nature and the character of the prohibited conduct." Arbitrator Petersen explicitly found that the nature and character of the offense in this case did not warrant termination.  Instead, he imposed a suspension of ten work days, a sanction clearly within

the range of "corrective actions" contemplated for a Level IV first offense violation.

The Court, therefore, cannot find that Arbitrator Petersen ignored the plain language of the CBA when he issued the Award.

### 3. Arbitrator Petersen's discretion comported with the essence of the CBA's proscribed limits.

In reviewing a disciplinary sanction imposed by an employer, an arbitrator "is authorized to disagree with the sanction imposed" and may reduce the sanction to one the arbitrator finds to be appropriate under the CBA. <u>Misco</u>, 484 U.S. at 41. Moreover, the Fourth Circuit has previously upheld arbitration awards that reinstated terminated employees and reduced sanctions from terminations to suspensions. One such case, <u>Westvaco Corp.</u>, 171 F.3d 971, is factually similar to this case and, therefore, particularly instructive.

After a female co-worker complained of numerous instances of sexual harassment, Westvaco Corporation ("Westvaco") discharged employee and bargaining unit member Mark Ravenscroft ("Ravenscroft") for violating its sexual harassment policies. 171 F.3d at 972-73. When questioned, Ravenscroft admitted to most of the conduct but indicated that he did not understand the severity of his actions. <u>Id.</u> at 973. Westvaco's sexual harassment policy, like the Code of Conduct in this case, did not mandate termination

for a violation, but instead provided that employees engaging in
sexual harassment "will be subject to disciplinary action up to and
including termination." <u>Id.</u> Westvaco's CBA provided for
arbitration of grievances but stated that "no arbitrator shall have
the power to substitute his or her own judgment for that of
Management, unless he or she finds that the Management has acted
arbitrarily . . . or in violation of this Agreement." <u>Id.</u>

The arbitrator found that Ravenscroft had violated Westvaco's
sexual harassment policy and that his acts warranted serious
discipline. <u>Id.</u> Nevertheless, he found that discharge was not
warranted because Westvaco officials were aware of the conduct and
did nothing to stop it, and the company did not provide Ravenscroft
with an opportunity to enter its Employee Assistance Program,
designed to assist employees with problems jeopardizing their
employment. <u>Id.</u> The arbitrator concluded that the company did not
have just cause to terminate Ravenscroft and that the company
should have applied progressive discipline in conjunction with
counseling and supervision. <u>Id.</u> The award reinstated Ravenscroft,
subject to a ninety-day unpaid suspension. <u>Id.</u> at 973-74.

After a district court overturned the arbitration award, the
Union appealed the decision to the Fourth Circuit. <u>Id.</u> at 974. In

MEMORANDUM OPINION AND ORDER

reversing the district court and reinstating the arbitration award,

the circuit court explained:

> In finding that the company wrongly terminated
> Ravenscroft, the arbitrator ruled that management action
> in this case violated the CBA's explicit requirement of
> "just cause." This ruling . . . leads to the conclusion
> that the company acted arbitrarily and in contravention
> of the CBA. These are precisely the circumstances where
> the collective bargaining agreement contract provides
> that the arbitrator may substitute his judgment for that
> of management.

Id. at 976. Ultimately, the court recognized that "we need not

(indeed cannot) address whether the [arbitrator's] interpretation

of [his] powers was the correct one. Even if incorrect, it was at

least arguably rational and 'drew its essence' from the arbitration

agreement...." Id. (alterations in original)(quoting Norfolk &

Western Ry. Co. v. Transp. Commc'n Int'l Union, 17 F.3d 696, 701-

02 (4th Cir. 1994)).

Like the arbitrator in Westvaco, in this case, Arbitrator

Petersen relied on the CBA to interpret his role in reviewing

Mylan's disciplinary action. He reviewed Mylan's management

practices for abuse of reasonableness and fairness. Finding such

abuse, he rejected Mylan's decision to terminate Jones because the

discharge was without just cause. Inasmuch as termination without

just cause is prohibited by the CBA, Arbitrator Petersen acted

within his power to impose what he believed to be a reasonable

sanction given the particular facts and circumstances of the case. It is not this Court's place to second guess his decision. Indeed "as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority," it matters not that a court may be convinced that he seriously erred in his decision. <u>Misco</u>, 484 U.S. at 38. Accordingly, the Court **CONCLUDES** that the Award drew its essence from the CBA, and that Arbitrator Petersen comported with the CBA's proscribed limits in determining an appropriate award. It therefore **UPHOLDS** the Award on this ground.

### IV. The Parties Shall Bear Their Own Attorneys' Fees

The Union asks the Court to award it attorneys' fees, arguing that this is Mylan's third challenge to an arbitration award in this Court, and, in light of the Court's prior ruling in <u>Mylan I</u>, this challenge lacks justification. The Union emphasizes that the CBA provides that arbitration shall be "final and binding," and that this is an important, negotiated for contractual provision which is undermined by Mylan's challenges.

Mylan responds that it initiated this suit in January 2007, before this Court issued its decision in <u>Mylan I</u>. It further argues that significant factual and legal differences exist between the cases that justify Mylan's challenge. Specifically, Mylan

points out that Jones' most serious offense in this case was classified as a Level IV violation, and that, unlike the offenses at issue in Mylan I, the Code of Conduct provides that termination is within the range of possible corrective actions for such an act. Mylan also emphasizes Jones' admission that he had manipulated test data on at least fifty occasions in the past, and argues that these manipulations may have led to adulterated products entering the stream of commerce, thus violating clear public policy.

"It has long been the general rule in the United States that a prevailing party may not ordinarily recover attorneys fees in the absence of a statute or enforceable contract providing for a fee award." Shimman v. International Union of Operating Engineers, Local 18, 744 F.2d 1226, 1229 (6th Cir. 1984)(en banc), cert. denied, 469 U.S. 1215 (1985). The Fourth Circuit has carved out an exception to this "American Rule," however, and held that "the courts' equitable powers should be exercised and fees should be awarded against 'a party who, without justification, refuses to abide by the award of an arbitrator.'" United Food and Commercial Workers, Local 400 v. Marval Poultry Co., Inc., 876 F.2d 346, 350 (4th Cir. 1989) (quoting Local 149, Automobile Workers of America v. American Brake Shoe Co., 298 F.2d 212, 216 (4th Cir. 1962)).

<u>**MEMORANDUM OPINION AND ORDER**</u>

Thus, in determining whether a challenge to an arbitration award is

unjustified, a court should look to the focus of that challenge.

> Where the challenge goes to the fundamental issues of
> arbitrability or of whether an arbitration award 'draws
> its essence' from the contract, the standard for
> assessing its justification is indeed the relatively
> lenient one of whether it has 'any arguable basis in law'
> . . . . Where, however, the challenge goes not to issues
> of the fundamental power of an arbitrator to make an
> award but to the merits of an arbitrator's award as made,
> the standard of justification is much more stringent.
> Indeed, because such challenges, if undeterred,
> inevitably thwart the national labor policy favoring
> arbitration, they must be considered presumptively
> unjustified.

<u>Marval</u>, 876 F.2d at 351 (citations omitted).

   In this case, Mylan challenged the Award on two bases: first,

that it violated clearly defined public policy; and, second, that

it failed to draw its essence from the CBA.  Both arguments fall

under the more lenient standard set forth in <u>Marval</u>, in which the

Court must ask whether Mylan had "any arguable basis in law" for

the challenge.  <u>See</u> <u>Westvaco Corp.</u>, 171 F.3d at 978 n. 3 (holding

that Westvaco's challenge to the arbitration award on public policy

grounds was not without justification, and denying the Union's

request for attorneys' fees).

   Although Mylan has not prevailed in this suit, the Court finds

that its claims are rooted in an arguable basis in law.  As it has

asserted, the facts of this case differ significantly from those in

<u>Mylan I</u>, both as to the seriousness of the violations and also as to the range of sanctions available for a Level IV violation. These raised genuine questions about Mylan's authority to discharge Jones under the CBA.  While the Court has concluded that the Award does not violate clearly established public policy, and does draw its essence from the CBA, it cannot find that Mylan's challenge to the Award was without any justification, and therefore **ORDERS** that the parties bear their own attorneys' fees in this case.

### V.  Conclusion

For the reasons stated above, the Court **DENIES** Mylan's motion for summary judgment (dkt. no. 17), **GRANTS** the Union's motion for summary judgment (dkt. no. 16), and **UPHOLDS** Arbitrator Petersen's award.  Given that no outstanding issues remain in this case, it is **DISMISSED WITH PREJUDICE** from the Court's docket.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to Counsel of record.

Date: March 6, 2008

/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE